**Evelyn T. SMITH, Executrix of the Estate of Verna Mae Taylor Crosby, Deceased, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civil A. No. 1:94–CV–460RR.**

United States District Court,
S.D. Mississippi,
Southern Division.

Feb. 13, 1996.

---

James T. Knight, Copeland, Cook, Taylor & Bush, P.A., Jackson, MS, for Plaintiff.

William D.M. Holmes, Attorney, Tax Division, U.S. Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

A bench trial was held in this matter before this Court on the 2nd and 3rd days of October, 1995. The action was brought by Evelyn T. Smith as Executrix of the Estate of Verna Mae Taylor Crosby, Deceased, seeking a refund of estate taxes paid to the Internal Revenue Service. This Court has jurisdiction of this action pursuant to the provisions of Title 28 U.S.C. § 1346(a).

## I. FINDINGS OF FACTS

### A. Introduction

The majority of the facts of this case have been established by agreement of the parties through pleadings and the joint pretrial order. Verna Mae Taylor Crosby departed this life on April 28, 1988, having a fixed place of residence in Picayune, Pearl River County, Mississippi. The Plaintiff, Evelyn T. Smith, is the duly appointed and acting Executrix of the Estate of Verna Mae Taylor Crosby, Deceased, probate of which is pending in the Chancery Court of Pearl River County, Mississippi. The Defendant is the United States of America; more specifically, the Defendant is the Internal Revenue Service (hereinafter the "IRS").

Two issues are raised by the plaintiff in her Complaint. First, she claims that collection of the federal estate tax liability in issue was barred by the statute of limitations prescribed by Section 6501(a) of the Internal Revenue Code. Secondly, there is a dispute as to the value of a promissory note owned by the decedent on the date of her death.

### B. Factual Background

A promissory note was originally issued by St. Regis Paper Company on May 17, 1977 to L.O. Crosby, Jr. of Picayune, Mississippi. Mr. Crosby was the husband of the decedent. The promissory note was in an original principal balance of $10,312,000.00. It was payable over a period of twenty (20) years in equal annual principal payments of $515,-600.00. Each principal payment received a payment of 6% simple interest computed from the inception of the note to the date of

payment, resulting in each payment of the note becoming progressively larger due to the increasing amount of interest.

The required payments due with respect to the promissory note, described above, were made timely by St. Regis Paper Company to Mr. Crosby until his death in 1978. His will bequeathed a two-thirds interest in the promissory note, described above, to Verna Mae Taylor Crosby, whose estate is subject of the above-entitled action. The remaining one-third interest therein was bequeathed to Ochsner Medical Foundation of New Orleans, Louisiana.

St. Regis Paper Company made timely payments of the required principal and interest payments due to Mrs. Crosby with respect to her two-thirds interest in the promissory note described above, from the date of her husband's death through May 17, 1981.

On March 17, 1981, two promissory notes were executed by St. Regis Paper Company to Mrs. Crosby and Ochsner Medical Foundation in exchange for their interests in the original promissory note of $10,312,000. One promissory note (styled "Exchange Promissory Note"), in the face amount of $5,499,-733.33, dated May 17, 1981, was made payable to Mrs. Crosby, and provided for yearly principal payments of $343,733.33 each, commencing on May 17, 1982 and continuing through May 17, 1997. As in the original promissory note, St. Regis Paper Company was also required to make yearly interest payments in the amounts set forth in payment schedule located in the body of this note. These interest payments increased each year. For example, the interest payment due on May 17, 1982 was $103,120, and the last interest payment required to be made on May 17, 1997 was $412,482.04. A similar exchange note was made to Ochsner Medical Foundation in the face amount of $2,747,806.67, but this note is not in issue here.

St. Regis Paper Company was merged into Champion International Corporation, a Fortune 500 Company, on January 31, 1985. Champion International Corporation then assumed the responsibility for paying the unpaid balance of $5,499,733.33 note, described above.

Mrs. Crosby died on April 28, 1988. On that date, the unpaid principal due with respect to the note of $5,499,733.33, described above, amounted to approximately $3,437,-733, and the interest required to be paid over the remaining term of the note amounted to approximately $4,124,800.

An estate tax return, Form 706, was timely filed by the estate on January 30, 1989. The estate tax liability shown on the return was paid in installments as permitted by the IRS with the final payment being made by the end of 1991.

Said federal estate tax return that was filed by the decedent's estate reported that the decedent still owned a two-thirds interest in the original promissory note of $10,312,000 which, for purposes of computing the appropriate estate tax liability, was given a fair market value on the date of her death of $3,348,500, based upon a valuation report by Mercer Capital Management, Inc. As discussed in more detail below, Mercer's approach to valuing the note was to first determine the future cash flows from the note, which remained on April 28, 1988 (date of death), and to discount them at an appropriate yield to maturity date. A discount rate was described as a capitalization rate—a note used to convert a stream of payments into a value. The report prepared by Mercer determined that a capitalization rate of 10.09% was appropriate based upon other Champion debts which the author considered to be similar to the note in issue here.

Based upon this analysis, Mercer concluded that the fair market value of the two-thirds interest in the said note on the date of death was $4,185,611. Then the alleged two-thirds interest was given a marketability discount of 20% ($837,122) on the ground that a two-thirds undivided interest limits the attractiveness of the note as an investment for a third-party purchaser. Hence the fair market valuation reached by Mercer was $3,348,500.

Thereafter the decedent's estate tax return was audited by the Internal Revenue Service, which concluded that the correct value of the decedent's interest in the said promissory note was $4,400,000, for purposes of comput-

ing the appropriate federal estate tax liability. This increase in valuation resulted in an estate tax deficiency of $410,838. On January 29, 1992, a statutory notice of deficiency was mailed to the executrix of the decedent's estate proposing an estate tax deficiency of $410,838, representing the deficiency which resulted from an increase to the value of the decedent's interest in the said promissory note.

The deficiency in estate tax in the amount of $410,838.00, plus interest, was paid by the estate on July 16, 1993 with a total payment of $714,195.70. Contemporaneously with the payment of the deficiency on July 16, 1993, the Plaintiff filed a Claim for Refund requesting a full refund of the estate taxes and interest paid. No response was received to the Claim for Refund and, after waiting the six months required by law, the Plaintiff commenced this litigation.

The estate tax deficiency asserted by the IRS relates entirely to the valuation of the promissory note payable by St. Regis Paper Company, the corporation that was later taken over by the publicly traded company, Champion International.

On or about April 25, 1994, the Plaintiff received a partial refund in the amount of $30,031.57. This amount apparently relates to a recomputation by the IRS of the interest paid by the Plaintiff.

## II.  CONCLUSIONS OF LAW

### A.  *Statute of Limitations*

■ At the trial of this cause there was no dispute that the estate of Mrs. Crosby filed a timely estate tax return on January 30, 1989, within nine months after the decedent's death. 26 U.S.C. Secs. 2051, 6075. Thereafter, the United States had three years from the due date of the estate tax return or until January 30, 1992, in order to make an additional assessment. 26 U.S.C. § 6501(a). By its issuance of the statutory notice of deficiency on January 29, 1992, only a single day prior to the expiration of the statute of limitations, the running of the statute of limitations was tolled for the 90 days provided in the statutory notice of deficiency and for an additional 60 days beyond that. 26 U.S.C. § 6213 and § 6503(a). This would have resulted in June 29, 1992 being the final day on which the IRS could have made an assessment.

The plaintiff submits that the assessment of the estate tax liability in issue was untimely and barred as it was made after June 29, 1992, and then back-dated to June 15, 1992, by an employee of the IRS. The defendant submits the assessment of the estate tax liability was made on June 15, 1992, and was timely.

The defendant submits that in interpreting the evidence at trial, it should set out how an assessment of federal estate taxes is made. Title 26, Section 6203 of the United States Code provides that "[t]he assessment shall be made by recording the liability of the taxpayer in the office of the Secretary [of the Treasury] in accordance with rules and regulations prescribed by the Secretary." An assessment is made by having an assessment officer fill out and sign a Treasury Form 23C, known as a summary record of assessment. *Geiselman v. United States,* 961 F.2d 1, 5 (1st Cir.1992), *cert. denied,* 506 U.S. 891, 113 S.Ct. 261, 121 L.Ed.2d 191 (1992); *see also, Dewberry v. United States,* 158 B.R. 979 (Bankr.Ct.W.D.Mi.1993).

The defendant submits that the record in the instant cause reflects that prior to June 15, 1992, the New Orleans District of the IRS requested that the Memphis Service Center make an estate tax assessment against the decedent's estate for the estate tax deficiency in question. At that time, Mr. Steve Compton, who is presently Chief of the Accounting Branch of the Memphis Service Center, and who held that position on June 15, 1992, was an assessment officer to whom the authority to make federal estate tax assessments was delegated by a delegation order dated October 15, 1991. Defendant's Exhibit 8.

Mr. Compton testified at trial that, pursuant to his authority as an assessment officer, he made an estate tax assessment against the decedent's estate for the estate tax deficiency in question. The defendant submits that this assessment was made by Mr. Compton on June 15, 1992, when he signed a summary record of assessment with respect to such

estate tax liability. Defendant's Exhibit 5. The trial record reflects that after the signing of the assessment document, the legal effect of which was to make the "assessment legal and collection enforceable" (Trial record, p. 192), it was reviewed by Section Chief Clint Hawkins, whose initials "CH" appear thereon. (Trial record, p. 193).

The defendant submits that this evidence establishes that the assessment was made on June 15, 1992, and not on a later date, and that said conclusion is further supported by a Certificate of Assessments and Payments with respect to the estate tax assessment. Defendant's Exhibit 7. Page 2 of this document also reflects, under the column 23C date (assessment date), that on June 15, 1992, the audit estate deficiency in issue of $461,743, together with interest of $198,633.32, was assessed against the decedent's estate by the IRS. Also, the defendant submits that the third column from the bottom of page 2 indicates that on June 15, 1992, the Crosby estate was given notice to the estate's executrix in Picayune, Mississippi.

The defendant also submits that the Fifth Circuit has established that a Certificate of Assessments and Payments is presumptive proof of a valid assessment when, as in the instant cause, the taxpayer has produced no evidence to rebut the presumption. *United States v. McCallum,* 970 F.2d 66 (5th Cir. 1992). See also, *Geiselman, supra,* at p. 6; *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991).

The defendant submits that the plaintiff did not introduce any evidence to support her contention that the assessment was made after the statute of limitations had expired, and thus was back-dated until June 15, 1992. Mr. Compton expressly denied that said assessment was back-dated; however, Mr. Compton did testify that there was a delay between the time that the assessment was made and the time that it was imputed into one of the computers at the IRS at the end of October of 1993, about 110 days after the June 15, 1992 assessment. Trial Record p. 211.

Yet, the plaintiff submits that it had no information from the IRS to the contrary. Rather, on September 7, 1992, the Plaintiff received a substantial refund from the Internal Revenue Service. This refund, as reflected by the IRS's own records, was in the amount of $50,635.00 tax reduction, plus $21,794.98 interest abatement. Statutory interest was added and a check in the amount of $78,350.64 was received by the Plaintiff. Receipt of this refund occurred more than two months after the final date available to the Internal Revenue Service for assessment of the deficiency. Several days later, on September 11, 1992, representatives of the taxpayer requested and received a computer transcript of the Plaintiff's account on the estate tax return. This computer transcript reflected the recent refund received by the Plaintiff but showed no additional assessment. The transcript concluded by showing a zero balance due from the Plaintiff.

This Court is disturbed by the fact that it knows of nothing more that could have been done by the Plaintiff in September of 1992 to ascertain the estate tax liability of Mrs. Crosby's estate other than what was done by the plaintiff. Certainly the IRS should be more careful with the information it distributes externally and "in-puts" internally. Mr. Compton testified that he was sure a one hundred ten day delay "exceeded the published guidelines for timeliness with respect to processing these documents" as it exceeded the usual two to three weeks. Trial record, testimony of Steven Compton, pp. 198–200, 222–224.

The plaintiff submits that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen, and that this principle holds even when the administrative action under review is discretionary in nature". *Service v. Dulles,* 354 U.S. 363, 372, 77 S.Ct. 1152, 1157, 1 L.Ed.2d 1403 (1957). *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). If the actions taken by the governmental agency falls short of the requirements of the applicable departmental regulations, then the actions of said departmental agency are illegal and of no effect. *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959).

Unfortunately, in the case sub judice the plaintiff should have known of the June 15, 1992, deficiency assessment against her within several weeks of the finding of said assessment. Also, if there is a presumption that the IRS documents show an assessment in June of 1992, then by the same argument the plaintiff should have been able to rely on the September 11, 1992, transcript which stated that the plaintiff owed a zero balance. Yet, these time limits are guidelines, not statutes, and in this instance although the Government should be reprimanded, its actions do not amount to such a violation that the *assertion* of a deficiency being owed will not be time barred. Whether the assertion is one without a basis will now be addressed.

## B. Valuation of the Promissory Note

█ As previously stated, at the time the estate tax return was prepared, and continuing through the time that this refund litigation was originally filed, both parties were under the belief that this original promissory note was still in effect and that the estate was the owner of an undivided two-thirds interest. The original valuation of the Plaintiff's expert, Mercer, dated January 20, 1989, and the initial valuation by the Defendant's expert, Scott Hakala of Business Valuation Services, Inc., dated June 20, 1995, were both prepared as valuations of an undivided two-thirds interest in the original promissory note.

Prior to trial, it was discovered that the original promissory note had in fact been reissued by St. Regis as two exchange promissory notes both being dated May 17, 1981. One of the exchange promissory notes was issued to Mrs. Crosby in an amount equal to two-thirds of the annual payments of principal and interest contained on the original promissory note. The second exchange promissory note was issued to Alton Ochsner Medical Foundation in the amount of one-third of the payments of principal and interest contained in the original promissory note. Both exchange promissory notes are identical with the original promissory note in all respects except for the names of the payees and the reduced payment amounts.

The Plaintiff's expert, Mercer of Mercer Capital Management, Inc., upon learning of the existence of the exchange promissory note, prepared an addendum to his valuation dated July 27, 1995. The plaintiff submitted at trial that the addendum was necessary as one of the factors Mercer considered in discounting the promissory note was the fact that it was only an undivided two-thirds interest; this factor was removed with the discovery of the exchange promissory notes. Mercer revised his valuation upward to the amount of $3,553,222.00 in his addendum. Hakala's report, dated June 20, 1995, evaluated the promissory note at $4,300,000.00. Hakala testified that the discovery of the exchange promissory notes had no impact on his valuation.

Both Mercer, testifying as an expert for the Plaintiff, and Hakala testifying as an expert for the Defendant, were accepted as experts by this Court based on their qualifications. In comparing the addendum to the valuation prepared by Mercer with the valuation prepared by Hakala, it is apparent that both experts used a similar valuation approach in valuing the promissory note.

Both experts compared the promissory note owned by the estate to publicly traded debt issued by Champion International. Both experts seem to agree that there were two publicly traded debt instruments of Champion International that were most comparable to the promissory note of the estate, and these publicly traded debt instruments were used a starting point in each expert's computation. Each expert selected a different bond issue of Champion International, with the result of a one-half interest point difference in the effective interest rates being used by the experts as their starting point.

From their starting points, each expert increased the effective interest rate of the publicly traded debt to compensate for differences between the estate's promissory notes and the publicly traded debt. Each expert then further adjusted the interest rate to reflect the fact that the publicly traded debt was paid on a semi-annual basis and the estate's promissory note was paid on an annual basis. Finally, each expert then used

the new effective interest rate he had computed to discount the future note payments to be received by the estate.

While the experts were generally in agreement with the valuation approach used and with the starting point, they were in substantial disagreement in how much adjustment was necessary to compensate for the differences between the estate's promissory note and the publicly traded debt of Champion International.

Hakala, testifying on behalf of the Defendant, selected a Champion bond with an effective interest rate of 9.6%. He then added a 0.5% to his starting point to compensate for the differences in the publicly traded debt of Champion International and the promissory note of the estate, coming to an interest rate of 10.1%. This was then converted to an effective annual yield of 10.36%, which he used in determining his valuation of $4,300,000.00.

Mercer, testifying on behalf of the Plaintiff, used a Champion bond issue having an effective interest rate of 10.09%. He then made a series of adjustments to the starting point as outlined below.

| | |
|---|---|
| Base Yield | 10.09% |
| | |
| Adjustments: | |
| | |
| 1. Marketability | 0.5% |
| 2. Lack of Indenture/Covenants | 1.0% |
| 3. Lack of Formal Acknowledgment by Champion | 1.0% |
| 4. Subordination to all better documented debt of Champion | 1.0% |
| 5. Uncertainty regarding the legal entity bearing liability | 1.0% |
| 6. Unusual payment schedule | 0.5% |
| 7. Lack of divisibility | 0.5% |
| | |
| Semiannual basis | 15.59% |
| | |
| Convert to annual convention (note payments made on an annual basis) | 16.2% |
| | |
| Required Yield Used | 16.0% |

In applying his interest rate of 16% to the future cash payments to be received by the estate, Mercer arrived at a value of $3,553,222.00.

In comparing the promissory note owned by the estate, which consists of a single page, to the publicly traded debt of Champion, which was registered with the Securities and Exchange Commission, it is obvious that there are many differences that would be apparent, even to a lay person. The publicly traded debt of Champion is well documented. The prospectus supplement alone to each of the publicly traded debt instruments is in excess of twenty pages. These supplements refer to many additional documents such as financial statements, legal opinions and the actual promissory notes, which are all a part of the public debt issuance and available to prospective purchasers. Both of the publicly traded debts of Champion are freely tradeable on a public exchange, are tradeable in denominations as low as $1,000.00, have significant legal protections in the event of default, and have restrictions on the business operations of Champion International to provide further security and comfort to a holder of these debt instruments.

This Court agrees that none of the above factors are present in the promissory note of the estate. As Mercer testified, the absence of these factors are important considerations in determining potential buyers for the promissory note payable to the estate. In Mercer's opinion, many buyers were eliminated as potential purchasers of the estate's promissory note. Financial institutions were eliminated due to the fact that the estate's promissory note was not rated by a firm such as Moody's or Standard & Poors, whereas the publicly traded debt was rated. Mutual funds were eliminated as potential purchasers based upon the lack of registration and lack of marketability of the estate's note. Insurance companies were eliminated as potential purchasers based upon the lack of documentation of the estate's promissory note, which could lead to criticism of this note being selected as an investment. Pension funds were eliminated as potential investors due to a possible violation of the "prudent man" rule. Individual investors, except for the wealthiest of individuals, were eliminated as potential investors due to the lack of divisibility and marketability.

Of significant concern to Mercer was the inability of his firm to obtain what he considered to be adequate information from Champion International during the latter part of

1988 when he was preparing his original evaluation. Mercer testified that his office made a number of telephone calls and had correspondence with Champion International in an attempt to determine whether St. Regis Paper Company, acquired several years earlier by Champion International, still existed as a separate entity and whether Champion had ever formally acknowledged liability for the estate's promissory note. He finally received a one page letter from Champion in which a representative of Champion concluded that Champion International was the successor of St. Regis Paper Company and was responsible for the promissory note in the name of L.O. Crosby, Jr. dated May 17, 1977. The Court notes that as of the time of this letter, dated December 6, 1988, the May 17, 1977 promissory note in the name of L.O. Crosby, Jr. had already been replaced by the two exchange promissory notes dated May 17, 1981; however, no mention of this is made in the letter.

The lack of response received by Mercer, which was made contemporaneously with his original evaluation, was a significant concern, as it was an indication that a hypothetical purchaser would also have problems obtaining information concerning the estate's promissory note.

This problem was recognized by Hakala in preparing his evaluation. In fact, Hakala made no independent attempt to contact Champion himself. Instead, he requested that the attorney for the United States contact Champion to obtain additional information. Pursuant to permission granted by this Court, the United States was permitted to take the deposition of Gerald Hoot of Champion International on September 13, 1995, less than one month prior to the trial. While Hoot was, at his deposition, able to provide clarification concerning the status of St. Regis Paper Company's acquisition by Champion International and of the replacement of the original promissory note with the two exchange promissory notes, it is important to note that the defendant had to depose Gerald Hoot, a representative of Champion International, to obtain this information. It is also important to note that this information was not in the hands of Hakala when he prepared

his report dated June 20, 1995, and yet he makes no mention of this in his report, nor does he make any adjustment for this lack of information in his valuation.

The definition of fair market value assumes a willing buyer and a willing seller, both being informed of the relevant facts and neither party acting under compulsion.

The information that would have been available to a willing buyer was the information obtained by Mercer Capital Management in 1988. The Court agrees with the plaintiff that this information was not adequate to answer all of the questions a reasonable willing buyer would have asked, and a prospective investor might not have had the ability or inclination to go to this much trouble to obtain information.

The defendant submits that the testimony of Mr. Gerald Hoot, Financial Officer of Champion Paper Company, by deposition introduced at trial, refutes the logic for most of the additional discounts in the Mercer report. Mr. Hoot testified that the decedent's promissory note would be payable in the same priority as other debts of Champion, that Champion has acknowledged it is responsible for payment of the note (as evidenced by a letter dated December 6, 1988, to Mercer Capital Management, Inc., from Champion International to this effect, Exhibit D–17), the promissory note in this issue is not subordinate to other debts of Champion, Champion is one corporation (rather than a series of "units") liable for the payment of the note, there is no pre-payment provision in the note, and all payments with respect to the note have been timely made from its inception. Moreover, the back-loaded interest payments makes the yield to an investor much larger than the 6% rate listed in the body of the note.

The Government's expert, Hakala, while acknowledging the numerous deficiencies in the estate's promissory note, refused to allow any more than a 0.5% addition to his interest rate. The plaintiff submits that this is a refusal to consider factors which would be of obvious importance to a willing buyer, making Hakala more of an advocate for the position of the United States than an impartial expert. The plaintiff submits that this is the

same conclusion reached by the United States Tax Court in the case of *First Chicago Corporation v. Commissioner of Internal Revenue,* 67 TCM 3150, 3151–2, Tax Court Memorandum Decision 1994–300, 1994 WL 284028 in which Hakala also testified as an expert on behalf of the Government.

In any event, both the Mercer appraisal and the Hakala appraisal identify fair market value as "the price that would be agreed upon by a good faith purchaser and a good faith seller, both being aware of all relevant facts and neither being under any duress." The relevant facts are those that existed in 1988. The Court agrees with the plaintiff that the information that was obtained, or unable to be obtained, by Mercer at that time is the only information relevant to the valuation of the note in issue. Under such circumstances, the Hoot deposition would be irrelevant when attempting to determine value as of April of 1988.

Furthermore, this Court cannot overlook the plaintiff's contention that the Hoot deposition does not refute the factors considered by Mercer in his evaluation. The deposition itself did not create any indenture documents; a significant factor in the Mercer evaluation was the fact that the promissory note in question consists of a single document with no protective covenants as compared to the publicly traded debt of Champion which consists, **inter alia,** of many rights and covenants designed for protection of the note holders.

Also, the Hoot deposition is not a formal acknowledgement of the debt by Champion. To this date Champion International has not personally signed a promissory note. Both the original 1977 promissory note and the two exchange promissory notes in 1981 were signed by St. Regis Paper Company which was later acquired by Champion International. Additionally, the apparent subordination to all other debt owed Champion International is also not cured by the Hoot deposition. This factor, as testified to by Mercer at trial, results from a comparison of the various protective covenants contained in the publicly traded debt of Champion to the lack of those covenants in the Estate's promissory note. The uncertainty of which unit of Champion would be liable for this debt was also a reasonable factor considered by Mercer. Trial transcript, pp. 427–28. The last two factors considered by Mercer, unusual payment schedule and lack of divisibility, speak for themselves.

Accordingly, this Court finds that the valuation by Mercer was reasonable and in keeping with the facts that existed in 1988 and which would have been available to a good faith purchaser at that time. The Hoot deposition testimony does not eradicate such factors; and, the evaluation of Hakala is not consistent with the facts of this case and did not take such factors into account. The Court therefore adopts the opinion of Mercer and places a value on the estate's promissory note at $3,553,222.00.

## C. Collection Costs

The plaintiff seeks recovery of attorney's fees costs in this action. Section 26 U.S.C. § 7430 permits the award of attorney's fees when the following four requirements are met:

1. The Petitioner prevails with respect to the most significant issue presented in the action;

2. The position of the Internal Revenue Service was not substantially justified within the meaning of § 7430(c)(4);

3. The Petitioners exhausted their administrative remedies; and

4. The amount of attorney's fees claimed is reasonable.

This Court is of the opinion that although attorney's fees are permitted in certain circumstances, that this particular case does not warrant the granting of such. Until certain factors regarding the two new exchange promissory notes and their respective evaluations came to light, experts for both sides of this litigation made relatively close evaluations. Although the experts reached different conclusions, the IRS reasonably justified its position, although the delays in assessing and handling the deficiency in issue were not normal. In any event, this Court will not award attorney's fees.

## III.   CONCLUSION

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the estate tax liability in issue was timely assessed and not time barred, although the assessment by the defendant was in error as set forth in this Memorandum Order;

**IT IS FURTHER ORDERED AND ADJUDGED** that the plaintiff is entitled to a full refund in the amount of $714,195.70, plus statutory interest from the date of payment on July 16, 1993, less $30,031.57 previously refunded to the plaintiff;

**IT IS FURTHER ORDERED AND ADJUDGED** that all other pending motions, if any, in this cause are hereby **MOOT** and as all the claims and rights and liabilities of all the parties have been adjudicated in this cause, that a Final Judgment shall be entered in accordance with the foregoing Memorandum Order pursuant to Rule 58 of the Federal Rules of Civil Procedure and Rule 9 of the Uniform Local Rules of the United States District Courts for the Northern and Southern Districts of Mississippi, by the *1st* day of *March,* 1996.

**SO ORDERED AND ADJUDGED.**